**In re Ruby Lee EAST, Debtor.**

**Bankruptcy No. 93–46817–H4–13.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Oct. 7, 1994.

Thomas A. Self, Susan Gummow, Houston, TX, for debtor.

### *MEMORANDUM OPINION*

WILLIAM R. GREENDYKE, Bankruptcy Judge.

This matter comes before me on Debtor's First Motion to Modify Chapter 13 Plan After Confirmation ("Motion to Modify") filed by Ruby Lee East ("Debtor") on March 25, 1994. Mellon Mortgage Company ("Mellon"), a secured creditor in the case, has filed an objection to Debtor's proposed modification. After having conducted a hearing on the motion on April 18, 1994, I took the matter under advisement and provided the parties with an opportunity to brief the issues involved. The dispute requires an analysis of the interplay between several of the

provisions within section 1322 of the Bankruptcy Code and relevant case law. For the reasons expressed herein, Debtor's Motion to Modify will be granted.

## I.

### *JURISDICTION*

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the District Court's standing order of reference. Furthermore, it constitutes a core matter within the meaning of 28 U.S.C. § 157(b)(2)(L).

## II.

### *STATEMENT OF FACTS*

As evidenced by Mellon's proof of claim in this case, on or about November 15, 1966, Federal National Mortgage Association ("FNMA") provided a loan in the principal amount of $10,650.00 to Debtor and Edward L. East, Debtor's husband at the time. The Easts used the money to purchase their principal residence in Houston, Texas. In order to obtain the loan, they executed a Deed of Trust Note (the "Note") and a Deed of Trust conveying a purchase money security interest in the property to FNMA. Mellon later obtained an assignment of the Note and accompanying Deed of Trust lien from FNMA.

Under the terms of the Note, monthly payments of $63.90 in principal and interest were to be made until the Note's maturity in December of 1996. In addition, the Deed of Trust obligated the Easts to make monthly payments into escrow for yearly insurance premiums and, according to representations of counsel, the Easts were responsible for making monthly payments into escrow for taxes as well.[1] Payments were made on the Note for approximately 26 years. However, in May of 1993, Debtor fell behind. On September 3, 1993, Debtor filed a petition for voluntary relief under Chapter 13 of the Bankruptcy Code.

Along with her bankruptcy petition, Debtor filed a Chapter 13 plan of reorganization (the "First Plan"). Under Debtor's First Plan, Debtor proposed to make monthly payments of $90.00 to the Chapter 13 trustee for a period of 36 months starting in October of 1993. In addition, Debtor, as a "disbursing agent," proposed to continue making normal Note payments of $153.00 per month (including insurance and taxes) to Mellon directly. The First Plan, in conjunction with Debtor's schedules, recognized a total indebtedness to Mellon of $4,132.00— $2,482.00 in *unmatured* Note payments and $1,650.00 in *matured but unpaid* pre-petition arrearages. Thus, under Debtor's First Plan, Debtor would continue to make monthly Note payments as they come due to take care of the unmatured $2,482.00 indebtedness, and would cure the arrearages of $1,650.00 through the trustee's application of $56.16 of each $90.00 plan payment to the arrearage debt during the first 34 months of the plan.[2] By order entered on December 13, 1993, Debtor's First Plan was confirmed.

Unfortunately, Mellon and the IRS each filed proofs of claim in the case after confirmation for amounts in excess of what the Debtor had contemplated in her plan.[3] Consequently, on March 25, 1994, Debtor filed

---

**1.** Total payments for principal, interest, insurance and taxes amounted to approximately $153.00 per month at the time of Debtor's bankruptcy filing.

**2.** Payments of $56.16 over 34 months total $1,909.55. This total factors in an interest rate of 8.00% per annum which is permitted for an over-secured debt. *See* 11 U.S.C. §§ 506(b), 1325(a)(5); *see also Rake v. Wade,* — U.S. —, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993).

**3.** Regrettably, the filing of post-confirmation proofs of claim is not an unusual occurrence in Chapter 13 cases. Rule 3015 of the Federal Rules of Bankruptcy Procedure requires that a debtor file a plan within 15 days of the bankruptcy's filing. Fed.R.Bankr.P. 3015(b). On the other hand, creditors have until 90 days after the first meeting of creditors to file a proof of claim. Fed.R.Bankr.P. 3002(c). To complicate matters further, a debtor is ordinarily required to begin making plan payments within 30 days of the plan's filing. 11 U.S.C. § 1326(a)(1). For this reason, it is normally impractical to delay confirmation until all proofs of claim have been filed in the case. The negative consequence, however, is

her Motion to Modify. Mellon's proof of claim asserts a total indebtedness of $4,766.21—$2,479.68 in unmatured Note payments and $2,286.53 in unpaid pre-petition arrearages (including late charges and fees). The proposed modification seeks to accomplish full payment of Mellon's claim, the IRS' claim, and Debtor's attorney's fees incurred in requesting the modification. All substantive provisions of the original plan would remain the same, including the amount of each plan payment; however, the term of the plan would be extended almost 20 months to a total of 55 months with the Mellon arrearages to be cured over the first 52 months of the plan. As with Debtor's First Plan, Debtor's modification proposes to continue direct payments from Debtor to Mellon for the unmatured Note payments as they fall due.

By its terms, Mellon's Note matures on December 1, 1996. The final payment on arrearages under Debtor's First Plan would have occurred on or about August 8, 1996. Mellon objects to the proposed modification because the modified plan provides for the last payment towards arrearages to occur *after* final maturity of the Note—on or about January 8, 1998. Mellon points to the following provision within the Note:

> [Payments shall be made] in monthly installments of SIXTY THREE and 90/100 Dollars ($63.90) each, including interest, one on the first day of each month hereafter commencing on the first day of January, 1967, and continuing until the principal and interest are fully paid, *except that the final payment of principal and inter-*

*est, if not sooner paid, shall be due and payable on the first day of December, 1996.*

Exh. "A" to Mellon's Proof of Claim (emphasis added). Thus, Mellon argues that Debtor's plan, as modified, violates section 1322(b)(2) of the Bankruptcy Code which prevents the modification of a secured creditor's rights where the creditor's claim is secured solely by the debtor's principal residence.

## III.

### *DISCUSSION*

Section 1329 of the Bankruptcy Code regulates the ability of a debtor to obtain post-confirmation modification of a plan.[4] Among other things, section 1329 requires that the modified plan meet the requirements of confirmation in section 1325(a) of the Code. 11 U.S.C. § 1329(b)(1). Section 1325 requires that a plan comply with "the provisions of this chapter and with the other applicable provisions of this title." *Id.* § 1325(a)(1). Thus, section 1325 incorporates by reference section 1322 of the Code. Section 1329 itself emphasizes the applicability of section 1322 to modifications in subsection (b). *See id.* § 1329(b)(1) (providing that subsections (a) and (b) of 1322 are applicable to modifications).

With respect to section 1322, subsection (a) sets forth a list of mandatory requirements for a Chapter 13 plan. *See id.* § 1322(a) (submission of future earnings to trustee, full payment of priority claims, and

that occasionally pre-packaged Chapter 13 plans fail to accurately reflect and treat all of the claims against the estate, necessitating subsequent plan modification.

4. Section 1329 provides in relevance:
   (a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor ... to—
   (1) increase ... the amount of payments on claims of a particular class provided for by the plan; [or]
   (2) extend ... the time for such payments....
   (b)(1) Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section

1325(a) of this title apply to any modification under subsection (a) of this section.
   [b](2) The plan as modified becomes the plan unless, after notice and a hearing, such modification is disapproved.
   (c) A plan modified under this section may not provide for payments over a period that expires after three years after the time that the first payment under the original confirmed plan was due, unless the court, for cause, approves a longer period, but the court may not approve a period that expires after five years after such time.
11 U.S.C. § 1329.

similar classification of claims). Subsection (b) of 1322, on the other hand, contains a list of permissive plan provisions. Three of these permissive provisions are integral to this case:

> Subject to subsections (a) and (c) of this section the plan may—
>
> .    .    .    .    .
>
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;
>
> (3) provide for the curing or waiving of any default;
>
> .    .    .    .    .
>
> (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

*Id.* § 1322(b)(2)–(3), (5). Subsection (b)(2) recognizes that a plan may modify the rights of a secured creditor, but not if the creditor's security consists solely of the debtor's home. *Id.* § 1322(b)(2). As recently as 1993, the Supreme Court has recognized the corollary rule to this permissive provision which is that "the 'other than' exception in § 1322(b)(2) *proscribes* modification of the rights of a homestead mortgagee." *Nobelman v. American Sav. Bank,* —— U.S. ——, ——, 113 S.Ct. 2106, 2109, 124 L.Ed.2d 228 (1993) (emphasis added). An express exception to this proscription is recognized in subsection (b)(5) of section 1322 which allows for the curing of a default and the maintenance of payments on a claim while the bankruptcy is pending where the claim constitutes a "long-term" debt (i.e. a debt for which the last installment will fall due after the last plan payment falls due). *See* 11 U.S.C. § 1322(b)(5) (available

to debtors "notwithstanding paragraph (2) of [§ 1322(b) ]"). Debtor's First Plan relied upon subsection (b)(5) for confirmation. Under Debtor's modified plan, the Mellon indebtedness would ostensibly constitute a "short-term" debt (i.e. a debt for which the last installment will fall due prior to completion of the plan) making subsection (b)(5) unavailable for Debtor's use. Consequently, the question before me is whether and to what extent an additional exception to the proscription is contained in subsection (b)(3) of 1322. Over the years, several courts have considered this question in varying contexts. *See, e.g., Seidel v. Larson (In re Seidel),* 752 F.2d 1382 (9th Cir.1985); *Grubbs v. Houston First Am. Sav. Ass'n,* 730 F.2d 236 (5th Cir.1984); *In re Endicott,* 157 B.R. 255 (W.D.Va.1993); *Blinde v. Spader (In re Spader),* 66 B.R. 618 (W.D.Mo.1986); *In re Leach,* 171 B.R. 58 (Bankr.W.D.Ark.1994); *In re Dixon,* 151 B.R. 388 (Bankr.S.D.Miss. 1993); *In re Harris,* 147 B.R. 17 (Bankr. N.D.Ohio 1992); *In re Gianguzzi,* 145 B.R. 792 (Bankr.S.D.N.Y.1992); *In re Williams,* 109 B.R. 36 (Bankr.E.D.N.Y.1989). Despite that fact, remarkably no binding case law exists to resolve the precise issue before me.

Section 1322(b)(3) permits a plan to "provide for the curing ... of *any* default." 11 U.S.C. § 1322(b)(3) (emphasis added). Mellon asserts that Debtor's proposed modification will violate subsections (b)(2) and (b)(5) of section 1322. Thus, initially Mellon appears to be questioning whether subsection (b)(3) is even available for Debtor's use. This issue was resolved in *Grubbs v. Houston First American Savings Ass'n,* 730 F.2d 236 (5th Cir.1984), wherein the Fifth Circuit, *en banc,* held that subsection (b)(3) could be utilized by a debtor to cure a pre-petition default on a home mortgage debt. *See id.* at 240–42; *see also Dixon,* 151 B.R. at 390. In *Grubbs,* the Court explained:

> [W]e must note that, upon our own examination of the [creditor's] second home-lien encumbrance, we note that it was not a long-term mortgage having its last payment (under its non-accelerated terms) to become "due after the date on which the

final payment under the plan is due." § 1322(b)(5). Instead, [the creditor's] loan was secured by a three-year home-mortgage, with the last payment (under its non-accelerated terms) becoming due *within* the term of the proposed plan. It is thus not a long-term debt within the plan-provision contemplated by § 1322(b)(5).

The acceleration triggered by [the debtor's] default in payment was thus curable under § 1322(b)(3), rather than [b](5). While the proposed plan might possibly not be able to "modify" the obligation to pay monthly installment amounts that became due on a home-mortgage subsequent to the filing of the Chapter 13 petition, § 1322(b)(2), it could nevertheless provide for the payment from future income of previously non-accelerated matured amounts that had become due prior to the filing of the Chapter 13 petition. . . .

*Grubbs,* 730 F.2d at 247 (emphasis added). Integral to the *Grubbs* outcome was the Court's analysis of the legislative history surrounding section 1322(b) and the Court's consequent determination that Congress could not have intended the "cure" provisions of section 1322(b)(3) to fall within the grasp of section 1322(b)(2)'s "modification" prohibition. *See id.* at 238–47; *see also Di Pierro v. Taddeo (In re Taddeo),* 685 F.2d 24, 27 (2d Cir.1982); 5 *Collier on Bankruptcy* ¶ 1322.07[2], at 1322–20 (Lawrence P. King ed., 15th ed. 1994).[5] Thus, while subsection (b)(2) of section 1322 generally prohibits the modification of a home mortgagee's rights, such proscription does not affect a debtor's ability to cure either "long-term" mortgage debts, § 1322(b)(5), or "short-term" mortgage debts, § 1322(b)(3).

■ This still leaves the question of whether the curative period may extend beyond the underlying indebtedness' maturity. Nowhere in the Bankruptcy Code is there any indication as to the time limitations for a cure under subsection (b)(3). *See In re Clark,* 738 F.2d 869, 871 (7th Cir.1984) (" '[C]ure' [is] nowhere defined in the Bankruptcy Code"). Mellon asserts that Justice Thomas' recent pronouncements in *Nobelman* support the argument that payment of any amount of a home mortgagee's indebtedness after the underlying note's maturity constitutes an impermissible modification of

---

5. Section 1322(b), as originally introduced in H.R. 8200, contained no restrictions at all on subsections (b)(2), (b)(3) and (b)(5). *See* H.R. 8200, 95th Cong., 1st Sess. § 1322(b)(2)–(3), (5) (1977). The subsequent Senate version, S. 2266, added the home mortgagee exclusion in subsection (b)(2), but left subsections (b)(3) and (b)(5) identical to the House's version. *See* S. 2266, 95th Cong., 2d Sess. § 1322(b)(2)–(3), (5) (1978). It was only after compromise on the floors of both the House and Senate that subsection (b)(2) was finally adopted in the form that the Senate had proposed. *See Grubbs,* 730 F.2d at 246. In exchange, the "notwithstanding" language was added to subsection (b)(5) to ensure that no one would mistake subsection (b)(2)'s proscription as preventing debtors from dealing with long-term mortgage debts beyond the three-to five-year period of a Chapter 13 plan. *See id.; see also* 124 Cong.Rec. H11,106 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S17,424 (daily ed. Oct. 6, 1978). In spite of all of this activity, however, legislators never suggested that subsection (b)(3) should be limited in its application to exclude home mortgage debts. Therefore, there is no reason to believe that such limitation was intended.

Furthermore, as a matter of simple statutory construction, there is no reason to believe that Congress intended subsection (b)(3) to be limited in its effect by subsection (b)(2) either. *See United Sav. Ass'n v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) (explaining that a statute's provisions are often "clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law"). If one were to interpret "cure" within the meaning of (b)(3) as constituting a form of "modification of rights" within the meaning of (b)(2) (thus preventing (b)(3)'s application to home mortgage debts), then the provisions of (b)(3) would only amount to a subset of the provisions in (b)(2). In other words, "modification" would include "cure" and (b)(3) would necessarily be subsumed by (b)(2) making (b)(3) nothing more than superfluous language. *Cf. Taddeo,* 685 F.2d at 27 (similarly explaining that subsection (b)(5) must not have been intended to be a subset of (b)(2)). Because of the maxim that significance and effect should be given to every word of a statute in order to avoid denying effect to any part of the statute, *Rake,* —— U.S. at ——, 113 S.Ct. at 2192; *Ex parte Public Nat'l Bank of New York,* 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202 (1928), subsection (b)(3) should be read instead as having an independent meaning from subsection (b)(2).

rights.[6] *Nobelman* involved an issue quite different than the one before this Court— whether section 1322(b)(2) prohibits a debtor from utilizing section 506(a) of the Bankruptcy Code to bifurcate a home mortgagee's claim into secured and unsecured portions for the purpose of treating the unsecured portion in a manner similar to all other unsecured claims. *See Nobelman,* —— U.S. at ——–——, 113 S.Ct. at 2108–11 (finding such bifurcated treatment to be in violation of § 1322(b)(2)). At no point did the Court consider the impact of subsection (b)(2) on subsection (b)(3).[7] Therefore, *Nobelman* really provides no guidance.

Mellon also cites *Seidel v. Larson (In re Seidel),* 752 F.2d 1382 (9th Cir.1985), a Ninth Circuit opinion which held that the cure provisions of section 1322(b)(3) may not be used to repay an indebtedness which has naturally (i.e. not by virtue of acceleration) become finally due prior to bankruptcy. *See id.,* 752 F.2d at 1383. Again, however, I question the impact of *Seidel* on the case before me. *Seidel* keyed-off of the fact that for naturally matured debts, the concept of cure is nonsensical. *See id.* at 1386 ("[W]hen a debt has already naturally matured—as in Seidel's case—'cure' as defined by these courts cannot aid the debtor, since reinstatement of the original terms of the debt will merely make the debt immediately due and payable"). Here we have no naturally matured debt; thus *Seidel* is inapposite.

Debtor, on the other hand, cites *Grubbs* in which the Fifth Circuit found that a debtor could repay ("cure"), under the authority of section 1322(b)(3), a home mortgagee's entire indebtedness, which had been accelerated pre-petition, over the life of the plan notwithstanding the fact that the underlying note would have fallen due prior to conclusion of the plan. *See Grubbs,* 730 F.2d at 237. Although *Grubbs* is not directly on point either (in that the entire indebtedness in *Grubbs* had become due pre-petition due to acceleration), I believe that the outcome in *Grubbs* supports Debtor's position. The Fifth Circuit in *Grubbs* permitted the debtor to provide for payment of the loan's remaining principal over the life of the plan, notwithstanding the underlying note's maturity within the plan's term. In the situation before me, Debtor proposes to complete payments on the Note's remaining principal by the time of the Note's maturity in 1996. Only the arrearages would be subject to final cure after the Note's maturity. Thus, Mellon will actually receive better treatment than the creditor in *Grubbs* did under the plan involved in that case.

## IV.

### *CONCLUSION*

This being the case, I find that Debtor's proposed treatment of Mellon in the modified plan falls within the permissive provisions of section 1322(b)(3) of the Bankruptcy Code. Consequently, by separate form of order Debtor's Motion to Modify will be granted and Debtor's modified plan will be confirmed, having found all other requirements of sections 1329 and 1325 to have been met.

**6.** In *Nobelman,* Justice Thomas illustrated the type of "rights" which are protected by section 1322(b)(2):

The [bank's "rights"] include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against [the debtor's] residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure.

*Nobelman,* —— U.S. at ——, 113 S.Ct. at 2110.

**7.** In fact, if anything, the Court acknowledged that section 1322(b)(2) is not absolute, but instead subject to certain other provisions within the Bankruptcy Code which "are independent of the debtor's plan or otherwise outside § 1322(b)(2)'s prohibition." *Nobelman,* —— U.S. at ——, 113 S.Ct. at 2110.